Okay, Kelsey, are you ready, Ms. Glover? Yes, Your Honor. Okay. So this is Asya Glover of Devil Rays and Plimpton for petitioner Syed Tazu. Under normal circumstances, he would be at the council table with me, but under the present circumstances, he is at the virtual council table watching the live stream. Just to start off with, I'd like to reserve two minutes for rebuttal. All right. The legal issues in this case are three. First, whether the respondents can, through deportation, deprive Mr. Tazu of access to relief promised by respondents' own regulations. Second, whether the respondents can deprive Mr. Tazu of due process and violate their own regulations by revoking his order of supervision without notice or opportunity to be heard. And third, whether this court has jurisdiction to hear these claims. The arbitrary and, frankly, upsetting circumstances of Mr. Tazu's immigration arrest and detention go to the heart of respondents' obligations in this matter. Because they demonstrate the arbitrary and capricious manner in which the respondents attempted to deprive Mr. Tazu of his liberty interest in pursuing relief. Let me ask this, Ms. Delvery. There was a time, I think it was 2009, I'm not really sure, when he received a voluntary departure or voluntary removal, is that right? And then he was given 30 days to effectuate that, and that didn't happen. And the voluntary order then converted to an order of removal. Is that right so far? So I believe that the voluntary order of removal was in, I believe, 2003. So it was on into that, right. And after the 30-day period, that wasn't effectuated and converted to an order of removal. Let me ask this. Once you get an order of removal, and he knew that he had the order of removal after that 30-day period, why shouldn't we assume that implicit in that is notice that at any point in time following that conversion, he is subject to removal? I know there's a real fairness argument there, and I get that. He's got a family. He's been here for a long time. But put the fairness and equity argument aside for a moment. Just in terms of pure law, why shouldn't we assume that he knew that he was subject to removal at any time after that 30-day voluntary removal didn't happen? So there's two points here. The first is the fact that he was under an order of supervision and had been under an order of supervision for 10 years since 2009. And as a result, he was operating under a situation where he was attending regular check-ins. And, you know, there's no dispute that he attended every single one.  And under those circumstances, he was essentially given sort of the due process argument that we presented is that he was given the ability to depend upon the fact that he was asked to come into ICE. He was asked to check in under that order of supervision. And there was some obligation from ICE to provide some notice that they weren't going to simply detain him at that check-in, which he had attended for 10 years. And so he was operating under permission from the government to live in the United States despite the fact that he had a final order of removal. And the regulations that the government promulgated that govern that order of supervision require some type of notice and informal review. Use the term permission. He was operating under the – he was here pursuant to the government's permission. And that's how you're looking at the continuing order of supervision. But that – one might assume in good faith that once you get that continuing order of supervision that you're here until you're then told, get your affairs in order. Next time we report, we're going to detain you. And that's kind of what your position is, that equity requires that. Due process requires that. I'm sorry. But again, isn't there some underlying implicit, maybe constructive knowledge that you can be detained at any time? You go in to report, and at any one of those monthly reporting sessions, you could be detained. Is that – and that may well be Mr. Sompot's argument. I hope I'm pronouncing that correctly. But what's wrong with that? That's what I'm missing. Why does it rise to the level of a constitutional deprivation? Right. So in this case, there's sort of – the second point is the fact that there is a provisional waiver process that he was in the midst of pursuing. So in this case, Mr. Tuzzi was in the process of pursuing a process which deportation would fundamentally and completely deprive him of. And in this case, by not providing him notice, by not providing him the opportunity to put his affairs in order, by not providing him the opportunity to have the ability to contest that revocation of order of supervision and ultimate detention and deportation, he was not provided the ability to gather his – he was not provided the ability to gather his affairs in order both for his family, but also in order to contest the order of supervision. There's actually no dispute still that ICE has failed to follow its own regulations, has not offered him – has not sent him informal notice of revocation – informal notice of a hearing to discuss the revocation of the OSIP, has not provided him an opportunity to contest that order of supervision, despite the fact that we've been arguing this for the past year and a half now. You make it sound as if his removal was totally arbitrary, but wasn't there an underlying reason why the government sought his removal at the time that it did? Did he comply with all regulations, for example? So I'm not sure. So as far as we know, there is absolutely no explanation that he has been – And that is the exact precise factor or characteristic that makes him eligible for the I-601A. So respondents are essentially, in other words, using the reason that Mr. Tezu is able to pursue relief under their regulations as the sole basis to deprive them of access to that relief. What is that regulation that you're referring to, the regulation that deprives them – that you mentioned that the government violated? So there's two regulations that are at issue here. The first is the regulation of the provisional waiver process, which is 212.7. And that is the regulation that governs the I-601A process. Is that E3 or E4? Two subparts there. Is it 212.7E3 or 212.7E4? So that is E4. So in this case, this is a regulation that created in 2016 the ability for individuals who do not – who are subject to a final order of removal, who have been in the United States, to stay in the United – to pursue – sorry. Does that regulation compel the government to guarantee his stay here while his application is pending? So our position is that it does, because removing Mr. Tezu on a sole basis that he has a final order of removal deprives him of the benefit of that regulation, deprives him of the – and I think more importantly, under Leslie, we have identified a situation where the government is not abiding by its own regulations. So the government here has vested exclusive jurisdiction to make decisions over these applications and to offer these applications in the USCIS. But DHS through ICE is depriving USCIS of its ability both to offer and to adjudicate those applications. So there's two – That seems correct with which suit we're in. Now, talk to us about the status of the suit that is now in the Second Circuit. This one that's before us today is an appeal from a habeas petition, but there's also the motion to reopen. So this one came from a district court up to the Court of Appeals, but there's also a motion to reopen in the Second Circuit. Describe the status of that suit and tell us whether you have asked that court for a stay. Right. So the status of that suit is that it is currently in – it is up in the Second Circuit with a petition for review of the denial from the BIA. We have asked that court for a stay, and the government in that – consistent with the forbearance policy in the Second Circuit did not contest that. There's no order for a motion to stay, but – Through the conclusion of those proceeding, right? Yes. That's the Second Circuit standard operating policy. There's no reason for that not to be followed. Yes. Now, that suit – you're raising an ineffective assistance of counsel Lozada argument in that suit, right? Yes. Right. So why is this the right suit in which to approach these issues? I mean, this is a habeas suit, and the Real ID Act of 2005, in response to Sincere, said it tried to exclude habeas as a vehicle for relief. These cases are supposed to come through the agency to the Court of Appeals on a petition for review. The Second Circuit one is in that proper procedural posture. So why is this even properly before us to be reviewing the validity of these rules on a habeas suit where the sole remedy under thursigium is a release from custody, but your client is not seeking release from custody. He's seeking a right to stay here, not release into the cabin of a plane bound for his home country. So I think there's a couple of points to make first in terms of substantively the claims before the Second Circuit and here are different. The claim before the Second Circuit is that the order of removal, the final order of removal is invalid, and that as a result of very severe and effective assistance of counsel, the immigration proceedings should be reopened. And the issue here is that regardless of whether or not the final order of removal is valid or invalid, the method by which respondents have attempted to detain and remove Mr. Tazu violate both the APA and the due process. Those are claims that simply can't be heard in the motion to reopen process. Those are claims that the BIA does not have jurisdiction to consider because they are not going to the validity of the final order of removal. So importantly, the issue is this connects up to Judge Fuentes' question. Your client, if this is just about the APA, your client could litigate these claims from his home country, right? But it's not. He doesn't want to be released into a plane to his home country. He wants to use a habeas petition to stay here, but that's not under thursigium. That's not what a habeas petition is supposed to be doing. So I think so, again, there's two points. The first is that he doesn't actually want he can't actually litigate these claims outside of the United States because the precise basis for the argument that the detention and removal of our client is unlawful is that by taking him outside of the United States, it deprives him of the ability to pursue these provisional labor process applications. It deprives him of the ability to file an I-601A because the regulations were specifically amended when creating that to state that nobody can apply for them outside of the United States. So this isn't a situation where he's saying, I'd like to stay in the United States simply so I can pursue my immigration proceedings. He's saying that I cannot seek this relief in any other way at any other time. And secondly, thursidium is, I think we identified this in the letter to the court in response to the government's letter. But importantly, that case was explicitly limited by the Supreme Court. That case was fundamentally different on the facts. We had a situation where a man had just walked over the border. He had entered for 25 yards. And in this case, this man has been in the United States. He was not subject to expedited removal, which, again, the Supreme Court limited its reasoning to in thursidium. And then importantly here, too, the challenges that Mr. Tezu is raising are to the legal authority to exercise discretion, not to the precise, exact relief that he is asking for, is to remedy constitutional violations. How do you confront Section 212.7? That's 8 CFR 212.7. It's the agency is interpreting its own regulation to provide no right to a stay of removal. How do you deal with that? Right. So there are a couple of different. I mean, there are sort of multiple points here. And I just like to go through them each in succession. The first is that as the Jimenez court. And I think we pointed this out in our briefing. But as the Jimenez court carefully walked through, that language does not actually that language does not actually refer to a stay of removal. It is a stay under a specific separate subsection of the regulations. Massachusetts, Massachusetts case. Right. And it walks through the analysis in that that that subsection referring to a stay is referring to a separate aspect of the regulations that say that essentially mean this doesn't create lawful status in the United States. So it's a way of articulating that this is not an ability to change your status. It is not actually say that this doesn't constitute a stay of removal authorized by the secretary. And again, as the Jimenez court pointed out, the respondents knew how to create that that type of restriction when they wanted to. Another point that's important to think about here is the fact that in the regulations that discuss that there there's no other language anywhere else that says that this doesn't constitute a stay of removal. And so the only other way that the district court and the government have attempted to import that in regulations that do not say that is by pointing to the interpretation of the regulations in 2013. The interpretation of the regulations in 2013 do not govern the language at issue here because the language at issue here was created in 2016 and is specifically relevant and specifically related to an individual who cannot pursue this process outside outside of the United States. And in those regulations, the 2016 explanation of the regulations explain that they amended the regulations specifically to make clear that jurisdiction to both offer and govern and adjudicate these applications was vested in the USCIS. So I think it's important to make sure we read the regulations as they're actually written and read the interpretations of those regulations that actually apply. Mr. Glover, could we talk about the regulatory process? There are three steps your client needs to go through. He's already gotten past the first step, the Form I-130, correct? He's filed the I-130 and he has an I-212 application. Now that hasn't been granted. Is that, was that denied or is that still pending? So that was denied. We received the file for the I-601 until after the I-212. If the I-212 has been denied, you're asking us to keep alive a space for him to complete a three-step process when he's been kicked out at Step 2. So you want a right to go back and redo this whole process. It's not like Step 2 is still pending, right? So our position is that Step 2 is still pending. I thought you just said it was denied. So it was denied, but he's appealing. And so our position is that in the specific circumstances of how 601A functions, because deportation would deprive him of the ability to file that I-601A, exhaustion of the I-212 process includes the appeal. And, you know, we are happy to provide additional briefing on this. We just got the actual denial last Friday, I think when we, the same day that we alerted the court to that denial. So we're happy to provide additional briefing on the effect of this. But our point is, you know, importantly, that denial, just as a matter of fact, was on the basis of the fact that he had a final order of removal and had stayed in the United States. So the exact basis, again, which makes him eligible to file an I-601A, which was created for individuals like him in 2016, is the basis upon which they denied him the I-212. So we believe we have a strong basis for the appeal. We think that the denial was arbitrary and capricious, and we believe that he will have an ability to overturn that denial. It sounds like then, under that basis for denial, that he can't get this relief until after the Second Circuit case leads to a favorable outcome. But why is this not a matter for the Second Circuit in the administration? If they find, in effect, an ineffective assistant counselor, some basis for invalidating the removal order, then they can consider whether to delay the issuance of the mandate or grant a further stay or some other follow-on relief, but it doesn't seem like something that we, is before us. I found it very strange, by the way, that the district court purported to opine on the motion to reopen before the Third Circuit, that is, before the Second Circuit. That seems like it was beyond their jurisdiction. It seems like it's beyond our jurisdiction to be trying to rectify something where the root problem you're pointing to, or the root obstacle, is now properly before the Second Circuit. Why should we be intervening here at all? The district court didn't have jurisdiction to say that, did it? At least as a matter of comedy, shouldn't we keep our hands off? Right, so I understand there have been cases that have distinguished between the jurisdiction over cases like the challenges that Mr. Tezu is raising to the due process violations and APA violations with regard to the provisional waiver process, and then the jurisdiction over the motion to reopen. Our position is still that there is jurisdiction over, not the motion to reopen, but the attempted removal before that motion to reopen was completed because they're based and grounded in the same due process violations that we articulate. I'm troubled by the, if the 212 has been denied, and that wasn't something I was aware of any of us were aware of until you just mentioned that, we cannot do anything anyhow, can we, until we see the result of that, even if you're right in all the other arguments, and we have the jurisdiction. Otherwise, we can't do anything while that appeal of the 212 denial is pending, can we? What can we do? No matter what we do, if the appeal of the 212 is lost, he's then kicked out of the three-step process, as Judge Bibas said, as step two. Isn't this premature for us to try to get involved until that appeal? The Second Circuit even complicates that further because I think Judge Bibas is right there. But that concerns me. I'm just not sure what we can do with an outstanding 212 appeal. So just to, I apologize if, so we sent a letter, just to correct or not, to make clear that, you know, we filed a letter, I think, last Friday on the day that we received the denial. So, you know, I apologize if that didn't somehow get to you. That may be my fault. It's probably with the clerk and I probably didn't see the email. Don't worry about that. But just in terms of the sort of the substantive point that you've raised, you know, our position is still to reiterate that exhaustion of the process until, exhaustion of the process is the issue here. But exhaustion means appealing the denial of the 212. It seems like you're caught in a trap there. I understand you want to exhaust. But it seems to me that means that we can't do anything until we see what happens on the 212 appeal. And if it's successful there, then these whole issues may well be ripe again. I assume he'll then go to the third step and then he may or may not win there. If he does win, then he's home free. If he doesn't, maybe we're back here. I don't know. But you did reserve some time, I think, two minutes. Yes, I did. Okay. Any other questions? Yeah, just a quick one. I just, based on what Judge McKee said, I mean, if we go forward with your request here, we, I mean, there's a strong possibility we may end up with inconsistent decisions. Totally inconsistent. We may agree and they may disagree. So isn't the most prudent course to wait and see what the Second Circuit says? So I guess I, our position would not, would be that there would not be an inconsistency in decisions, largely because the substantive issues that we're presenting before the Third Circuit are different from those, both in the I-212 process and in the, and in the Second Circuit. The issue before the Second Circuit is whether his motion to reopen can be equitably told based on ineffective assistance. You want to go all the way back to day one, basically. The Second Circuit would wipe the state clean and start the process anew. And all we're asking for here, and is what we believe is correct, is that Mr. Tezu has a right to stay in the United States pending a specific, discreet, and frankly short process. And that is not inconsistent, whether he is allowed to stay in the United States to finish that is not, you know, a yes or no on that does not conflict with whether his final order of removal is invalid because that, the validity of his final order of removal is not an issue here. And also, whether or not the appeal of the I-212 denial is granted. The issue there is whether or not Mr. Tezu is eligible for or should be given that I-212. It is not whether he should be allowed to stay in the United States to finish the process. So, our position is that there wouldn't be any inconsistency between those three questions. Okay. Go ahead. No, I'll hold off. That's okay. Okay. Rebuttal. Okay, thank you. Mr. Am I pronouncing your name correctly? Is it Sempat? Is that correct? Sempat, Your Honor. Say it again, please. Sempat, okay. Go ahead. Thank you, Your Honor. Good morning and may it please the Court, James Sempat on behalf of the appellees. Petitioner here is seeking review of the government's discretionary decision to execute a lawful removal order after he failed to depart the United States 17 years ago and has waited years to pursue the motion to reopen and the provisional waiver, unlawful presence waiver. As this Court has questioned Petitioner's counsel, there are four separate jurisdictional issues present in this case. The first is that there is no judicial review of the discretionary decision to execute a removal order. That's correct, Your Honor. The second is that the APA cannot be used to review both a decision that is left to the discretion nor can it be used to review a decision that Congress has expressly precluded from judicial review as it has in 1252J. As Judge Bevis noted during questioning, Petitioner's motion to reopen claims are barred by 1252A5 and B9, which channel the questions of law and fact to the Court of Appeals through the PFR process. And finally, Petitioner's invocation of the suspension clause cannot hold because the writ of habeas corpus is meant to secure release and as Petitioner admits in his opening brief and reply brief, he is no longer seeking simply release from custody. Can we review a decision that is clearly arbitrary and capricious? If we made that determination, could we review the decision? Your Honor, I think it would depend on what decision that is arbitrary and capricious because if it's the decision to execute a removal order, that decision is barred from review under 1252J. So if we are, does your position here that this is about executing a removal order require us to shield from review decisions about detention or prolonged detention? Help us to understand how you can win without shielding large swaths of this process from judicial review. Well, Your Honor, detention and unlawful detention, prolonged detention are still proper before the court and can be reviewed and Thursigium does not foreclose that. And, you know, Jennings didn't invoke the suspension clause to say that it was barred from review there, nor does it do it here. As the Supreme Court said in Thursigium, the purpose of the writ of habeas is meant to secure release. So if an alien, if an individual has prolonged detention and that detention now runs a foul or due process, that is something that the court would have jurisdiction to review. Now, where's the limiting principle? Because here, in order to execute the removal order, you picked up Mr. Tazu and, you know, takes three days. You've got to put him on the plane. Are those three days? Is there some minimum period that's inherently bound up in an ordinary removal? Like what what should we treat as covered by that exception? Well, Your Honor, Mr. Tazu was detained after ICE was able to secure a travel document. So his detention at that point was lawful in order to enforce the removal order. And the regulations allow ICE to revoke an order of supervision in order to enforce a removal order. Now, prolonged detention is completely different. Under Zabidas, for someone in Tazu's position, it would be, you know, six months after six months of detention. There's a question as to whether or not his detention, his continued detention would be warranted. So that would be the limiting principle. Your adversary says that under cases like Garcia, that we have to review whether there is discretion or authority here. How do you distinguish our decision in Garcia? Is your adversary correct? Well, Your Honor, I think the way the government answers that is that if the question is whether or not ICE has legal authority, it's simply reframing the discretionary decision as a legal question. And as the Second Circuit noted in the Ragbeard decision just last year. Forgive the interruption. I apologize for interrupting. It looks like we lost Judge McKee. So if we could turn it over for a moment. Sure. Thank you. Thank you very much. Thank you. OK. Hello again, Judge. I'm sorry. I missed about four or five minutes there. Yeah, we paused once I saw that you disconnected. We just don't have your picture just yet. Oh, that I can fix. That's easy. I was asking about the understanding of discretion and what discretion is reviewable. And we had this Garcia decision that Ms. Glover whether we have authority to act or not, whether the government has authority to act under a provision is reviewable. And Mr. Somput was beginning his response. Thanks. So, in order, you know, if it's something that, you know, that an individual would challenge the legal authority for ICE to execute a removal order. The Second Circuit address that exact question in Ragbeard and said that there are just there, it would basically just require a magic words test, which would be that any quote any claim could be just reframed as a legal question. And as to whether or not ICE has a legal authority to execute the removal order. And the second way to answer that, Your Honor, is also that, you know, Mr. Tazzy, you can see it's a very important point in that he has an outstanding lawful final removal order. So, ICE is well within its authority. She didn't concede it was removal, that it was lawful. There's a, there's an underlying challenge there to the initial proceeding that led to that removal order, based upon what appears to be a pretty strong claim of ineffective assistance of counsel. And, Your Honor, up until that motion to reopen is granted and Mr. Tazzy's proceedings are reopened, he has an outstanding removal order that may be executed. Now, as you know, as this court noted during my colleagues time, is that all those questions are supposed to be channeled through the PFR process into the Second Circuit and are now currently pending before the Second Circuit. You would have no problem if we held this matter, CAV, pending two things, I guess. Pending resolution of the Second Circuit's decision. That also, it seems to me, it would be equitable, at least, and there may well be a legal argument that Ms. Glover is making this valid, is that we hold off any ruling until the appeal of the denial of Step 2 is adjudicated. Well, Your Honor, the government actually respectfully disagrees with that. What is wrong with the court waiting to see whether or not your own agency will agree with Mr. Tazzy and reverse the decision in Step 2? Help me understand, other than just the fact of litigation posture, what is wrong with doing that? Your Honor, the thing is, is that Mr. Tazzy now has filed... We understand, we understand all that. The problem is she has an appeal pending of him being kicked out in Step 2. If I were to stop the average sixth grader on the street and explain the situation and say, gee, do you think that we ought to wait and find out whether or not this guy, the step that he was kicked out of Step 2, whether or not the government decides, okay, we'll let him proceed through the waiver process. We're not talking about somebody who's a member of La Costa Lewisburg here. This guy's been here for a while. He's got two kids. As I said earlier, it's almost like Kafka's The Trial. I mean, the guy wakes up one morning, except he was going to a regular reporting order. He's taken into custody with no warning at all. I just he shows up. He's his wife and family and goes to report assuming he's going to be back for lunch or dinner or whatever. And he's hauled off to prison in New Jersey. It's just that doesn't bother you in the slightest, I assume. No, Your Honor. Of course not. Your Honor, the government understands the potential issues and the equities in this case and is well aware of the posture of that. However, Mr. Tazzo has received the relief that he's seeking, which is a stay with the Second Circuit. Right. So that again, that is the Second Circuit is the proper forum in which to litigate these issues. And he has he filed for a stay. The government in that proceeding has filed and has not opposed the stay. So he's already received that relief. So there's nothing there isn't. The government's position here is that there's no jurisdiction to do anything because everything else is is with the Second Circuit and is proper within the Second Circuit. As for, you know, as for petitioners, APA claims, they're they're also barred both because Congress has precluded them from review and because the decision to remove an individual is discretionary. If I may just touch on a point that Judge Fuentes made regarding the potential of inconsistent decisions between this court and the Second Circuit. And that's exactly why 1252 A5 and B9 have channeled those questions through the PFR process. And the question about equitable tolling is probably before the Second Circuit. Anything from just be this. How do you discuss how you think that fits with our recent decision and, you know, H.C. Well, Your Honor, and, you know, H.C., you know, the court found jurisdiction and and and claimed and saying it was now or never claim. So the way to the way the government would address that is that this is not an hour never claim. So that brings the government to one point, which is that petitioner has argued that he would be deprived of the opportunity to seek a provisional waiver if he was removed. That's actually not the case, Your Honor. Petitioner can still seek a waiver of inadmissibility from overseas so he can file his 212, which has now been denied. Even if we assume had been granted that that application could still be filed overseas and go through adjudication then. So petitioner is not without recourse there and it would not be deprived the opportunity of seeking a waiver of inadmissibility based on his unlawful presence in the United States. Well, doing that overseas, as I understand, it could take not just months but years to get addressed. It seems to me more efficient if something like that were to be done while he's in the States. Isn't that correct? Your Honor, the government understands that, but there's a there's a couple ways to answer that. The first is that Mr. Tassu first waited to seek this provisional waiver until he was taken back into custody. The amendments that allowed Mr. Tassu to be eligible, potentially be eligible, were passed in 2016 and he did not file any application until he was taken back into custody in 2019. Well, as I understand, as I recall, he had a serious problem with counsel and counsel was not attentive to the process as he should have been. Isn't that part of the background here? Your Honor, the government does recognize that there is a potential issue of counsel, but again, it's on Mr. Tassu to seek forms of remedy and relief that he may be eligible for. Even if he's not aware of them? I'm sorry? Even if he's not aware of them, if prior counsel did not advise him of it, he's nevertheless obligated to pursue something he does not know exists. Well, Your Honor, he is pursuing them, but he does not necessarily have to pursue them from the United States. He can pursue them from overseas. And he has a LAZADA claim for ineffective assistance he can pursue. Would that part of the LAZADA claim be before the Second Circuit? I'm sorry, I'm not sure I understand your question, Your Honor. If counsel was ineffective in doing so under LAZADA, he still raised that as a claim as to why he should be granted relief, notwithstanding his counsel's ineffectiveness, right? Right, and that would be brought up before the Second Circuit. So, ultimately, Petitioner's concern is with the government's decision to execute a removal order as the government argued in its briefing here today that runs afoul of several jurisdictional bars, and therefore, this court should find that the district court improperly exercised jurisdiction over Petitioner's claims. If the court has no more questions at this time, the government rests on its briefs. Do you think anything further, Judge Bibas, Judge Fuentes? Nope, that's from me. Okay, Ms. Dover, you reserved a couple of minutes. Do you agree, let me ask, do you agree that the ineffective assistance of counsel claim is, in fact, before the Second Circuit? Because that would seem to be the easiest way to resolve this thing. If counsel is as bad as has been represented, and apparently the immigration judge even at some point, maybe the BIA, commented on the incredibly bad representation that the client had received. It's not just a make wait kind of claim. If that claim is before the Second Circuit, that does seem to basically create a whole new day for your client. Is that claim before the Second Circuit? That claim is before the Second Circuit, and you're right that Judge Salas did note the extraordinary circumstances of this case, of his case. Our position is that, you know, the questions at issue in the Second Circuit are different from the questions at issue here in that what we're asking for here is just exhaustion of this I-212 process, this I-601A process. But if the court's position is that it should wait, our position is that that may be denied. Even if we allow you to exhaust, let's assume that we allow you to exhaust, and you're denied the 212 appeal. Well, you're no better off than you are now. And we can get into a situation where we say, okay, Ms. Lova is right, and let the case go forward. You lose the 212 appeal. Then the Second Circuit's in a situation where, yeah, there was ineffective assistance of counsel. But meanwhile, he hasn't gone through these steps necessary for naturalization, so he's still gone. That really is a cough gas kind of posture. Could that happen? It does seem possible. I think that's sort of the basis of our claim here is that there are these cough gas processes throughout, in that there's this, you know, for example, the specific creation of regulations to benefit individuals specifically like Mr. Tezu. And then that is the specific basis for removing him. But I think you're right that the point here is that the Second Circuit could completely open up the entire case. We think that the facts are extraordinarily strong in Mr. Tezu's case. And you're right also that the difference between today and, you know, a few months from now, two months from now, however long it takes the appeal process to be finished, that sort of there's not a meaningful difference between that time. And I think that it makes sense to wait for those two processes to be done, at the very least for the appeal process and the 212 to be done. There's no indication that Mr. Tezu is in any way causing harm to anyone. The waiting of that extra couple of months is just a drop in the bucket in comparison to the 10 years that the government waited to attempt to deport him after his expulsion. I may have missed it. What is his current status? I mean, he's not in detention, is he, or is he being held in detention? No, in May 29th, I believe we secured the government's agreement to, they stipulated to his release. Yeah, okay. I think, you know, I have no further points, so I'm obviously happy to continue to answer questions, but no other points. Okay. I have nothing further. Judge Bevis, Judge Fuentes? No, nothing further. I do want to thank you, Ms. Glover, and your firm for representing Mr. Tezu pro bono. It's a very important service that you provide, and these cases could not be processed. The law here, especially, is so complicated and so intricate that somebody who tries to dance through this web by themselves is probably running a fool's errand. So, you really did consult and manipulate this maze, and we're very appreciative to you and your firm. And could you please take that back to whomever at the firm is the one who is in charge of making these kinds of decisions in terms of whether or not to represent somebody? Absolutely. Thank you very much, and I will do. Thank you. Thank you both for a very helpful argument. We'll take the matter under advisement. Sorry, I've got one last question for Ms. Glover, if that's all right. Sure. Ms. Glover, your position is you can't pursue this relief from overseas. If we can pursue it, you know, wouldn't that whatever due process already has to be satisfied by being able to file the form from overseas? Explain how that fits within your due process argument. That's right. I mean, our due process argument and our APR argument are both grounded in the fact that he cannot pursue this I-601A outside of the United States. I mean, I think it's important to make a distinction between I-601A and I-601, which I think the court has already identified that the I-601A was specifically created to reduce the amount of time that it took people who were filing from abroad under the I-601A. But Mr. Somput is not incorrect that he can pursue the other form from overseas. I-601A is the expedited version, but he could still pursue a I-601 from overseas. That's correct. It does not change the fact that a specific benefit created specifically for him was deprived on the basis of the fact of the key characteristic that makes him eligible for that benefit. But it's correct that he could pursue that from abroad. All right. Thank you. Thank you very much. We'll take the matter under advisement.